**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| TIM LAGROU, *et al.*, | ) | CASE NO.: 3:13-cv-00947-JGC |
| | ) | |
|      Plaintiffs, | ) | Judge James G. Carr |
| vs. | ) | |
| | ) | Magistrate Judge James R. Knepp |
| WHIRLPOOL CORPORATION, | ) | |
| *et al.*, | ) | |
| | ) | |
|      Defendants. | ) | |
| _____ | | |

**MEMORANDUM IN SUPPORT OF WHIRLPOOL CORPORATION'S**
**MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

RELEVANT BACKGROUND .............................................................................................. 3

I.     STATEMENT OF ALLEGED FACTS ........................................................................ 3

     A.    Whirlpool's Ownership, and Plaintiffs' Use, of the Park ...................................... 3

     B.    The Childhood Cancer Cluster in Sandusky County ............................................. 4

     C.    Plaintiffs' Alleged Injuries ................................................................................. 5

II.    PROCEDURAL HISTORY ...................................................................................... 7

ARGUMENT ..................................................................................................................... 8

I.     STANDARD OF REVIEW ....................................................................................... 8

II.    THE LAGROUS AND PERSONAL INJURY PLAINTIFFS FAIL TO STATE
NEGLIGENCE CLAIMS FOR WRONGFUL DEATH AND PERSONAL
INJURY ............................................................................................................... 9

     A.    Plaintiffs Fail to Allege Facts Showing Whirlpool Breached a Duty ................... 9

     B.    Plaintiffs Fail to Plead Facts Supporting Their Speculation that
Whirlpool's Alleged Breach of Duty Proximately Caused Their Injuries ........... 11

          1.    Plaintiffs fail to allege that PCBs or other (unnamed) chemicals
found at the Park are generally capable of causing their alleged
injuries ............................................................................................... 11

          2.    Plaintiffs fail to allege facts showing that Whirlpool's alleged
breach of duty specifically caused their injuries ...................................... 12

III.   PLAINTIFFS FAIL TO STATE INTENTIONAL TORT CLAIMS FOR
PERSONAL INJURY OR WRONGFUL DEATH ........................................................ 16

IV.   PLAINTIFFS' MEDICAL MONITORING "CLAIM" SHOULD BE
DISMISSED ......................................................................................................... 17

     A.    Ohio Does Not Recognize a Medical Monitoring Cause of Action ..................... 17

i

B.  Plaintiffs Have Not Pled the Elements Necessary to Obtain a Medical Monitoring Remedy under Ohio Law ................................................................. 17

V.  THE REPRESENTATIVE PROPERTY PLAINTIFFS FAIL TO STATE A CLAIM FOR DAMAGE TO PROPERTY INTERESTS ................................................. 19

VI.  THE REPRESENTATIVE PROPERTY PLAINTIFFS FAIL TO PLEAD A CONTINUING NUISANCE CLAIM ......................................................................... 21

A.  Plaintiffs Do Not Allege a Continuing Nuisance ................................................. 21

B.  Plaintiffs Fail to Sufficiently Allege a Permanent Nuisance Claim ..................... 23

1.  Plaintiffs fail to sufficiently plead an "invasion" of their legal interests ...................................................................................................... 23

2.  Plaintiffs fail to plead Whirlpool intended to cause Plaintiffs' injuries ......................................................................................................... 24

3.  Plaintiffs fail to allege the "toxic chemicals" caused Plaintiffs' injuries ......................................................................................................... 25

VII.  PLAINTIFFS FAIL TO PLEAD A STRICT LIABILITY CLAIM ................................ 27

A.  Plaintiffs Have Not Pled Facts Sufficient to State a Strict Liability Claim .......... 27

B.  Plaintiffs' Strict Liability Claim Is Subsumed by Their Nuisance Claim and Should Be Dismissed for the Same Reasons ................................................... 29

CONCLUSION ................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Abraham v. BP Exploration & Oil, Inc.*,
778 N.E.2d 48 (Ohio Ct. App. 2002) ........................................................................ 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................... 8

*Ashtabula River Corp. Grp. II v. Conrail, Inc.*,
549 F. Supp. 2d 981 (N.D. Ohio 2008) ............................................................... 21, 22

*Banford v. Aldrich Chem. Co.*,
932 N.E.2d 313 (Ohio 2010) ............................................................................... 25, 26

*Bd. of Cnty. Comm'rs v. Brown Grp. Retail, Inc.*,
598 F. Supp. 2d 1185 (D. Colo. 2009) ...................................................................... 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 8, 13

*Chance v. BP Chems., Inc.*,
670 N.E.2d 985 (Ohio 1996) ...................................................................................... 20

*Chance v. BP Chems., Inc.*,
Nos. 66622, 66645, & 67369, 1995 WL 143827 (Ohio Ct. App. Mar. 30, 1995) ....... 29

*Coppola v. Smith*,
No. 1:11–cv–1257 AWI DLB, 2013 WL 1281591 (E.D. Cal. Mar. 26, 2013) ........... 21

*Davis v. World Sav. Bank, FSB*,
806 F. Supp. 2d 159 (D.D.C. 2011) ........................................................................... 10

*Day v. NLO*,
851 F. Supp. 869 (S.D. Ohio 1994) ........................................................................... 17

*First Prop. Grp., Ltd. v. Behr Dayton Thermal Prods. LLC*,
No. 3:08-cv-329, 2011 WL 4073851 (S.D. Ohio Sept. 13, 2011) .............................. 17

*Fletcher v. Conoco Pipe Line Co.*,
129 F. Supp. 2d 1255 (W.D. Mo. 2001) ..................................................................... 28

*Ganton Techs., Inc. v. Quadion Corp.*,
834 F. Supp. 1018 (N.D. Ill. 1993) ............................................................................ 28

*Hirsch v. CSX Transp., Inc.*,
656 F.3d 359 (6th Cir. 2011) ................................................................................ 17, 18, 19

*Hurier v. Ohio Dep't of Transp.*,
No. 01AP-1362, 2002 WL 2005755 (Ohio Ct. App. Sept. 3, 2002)........................................... 27

*In re Heparin*,
MDL No. 1953, 2010 WL 547322 (N.D. Ohio Feb. 9, 2010) ......................................... 13, 16, 29

*In re Telectronics Pacing Sys., Inc.*,
168 F.R.D. 203 (S.D. Ohio 1996) ...................................................................................... 17

*Kerner v. Terminix Int'l Co.*,
No. 2:04-CV-735, 2008 WL 163609 (S.D. Ohio Jan. 17, 2008) ............................................ 9

*Kramer v. Angel's Path, L.L.C.*,
882 N.E.2d 46 (Ohio Ct. App. 2007) ............................................................................ 21, 23, 24

*Lally v. BP Prods. N. Am., Inc.*,
615 F. Supp. 2d 654 (N.D. Ohio 2009) ............................................................................. 21, 22

*Lewis v. ACB Bus. Servs., Inc.*,
135 F.3d 389 (6th Cir. 1998) ........................................................................................ 10-11

*Littleton v. Good Samaritan Hosp. & Health Ctr.*,
529 N.E.2d 449 (Ohio 1988) .............................................................................................. 9

*Maddox v. L.O. Warner, Inc.*,
No. 15468, 1996 WL 50152 (Ohio Ct. App. Feb. 7, 1996) ............................................... 9

*Mann v. CSX Transp., Inc.*,
No. 1:07-cv-3512, 2009 WL 3766056 (N.D. Ohio Nov. 10, 2009)............................... 17, 18, 19

*Mezibov v. Allen*,
411 F.3d 712 (6th Cir. 2005) ............................................................................................ 8

*Miami Valley Hosp. v. Cmty. Ins. Co.*,
No. 3:05-cv-297, 2006 WL 2252669 (S.D. Ohio Aug. 7, 2006) ............................................ 7-8

*Natale v. Everflow E., Inc.*,
959 N.E.2d 602 (Ohio Ct. App. 2011) ............................................................................... 23

*Neville v. City of Wyo.*,
No. C-020064, 2002 WL 31094766 (Ohio Ct. App. 2002) ......................................................... 30

*New Albany Tractor, Inc. v. Louisville Tractor, Inc.*,
650 F.3d 1046 (6th Cir. 2011) ........................................................................................... 8

*O'Brien v. DiGrazia*,
544 F.2d 543 (1st Cir. 1976) ............................................................... 12

*Oros v. Hull & Assocs., Inc.*,
302 F. Supp. 2d 839 (N.D. Ohio 2004)................................................... 29

*Pinares v. United Technologies Corp.*,
No. 10-80883-CIV, 2011 WL 240522 (S.D. Fla. Jan. 19, 2011)............... 15, 20, 21, 24

*Pluck v. BP Oil Pipeline Co.*,
640 F.3d 671 (6th Cir. 2011) ............................................................... 11, 13

*R.T.G., Inc. v. State*,
780 N.E.2d 998 (Ohio 2002).................................................................. 24, 28

*Ramirez v. Akzo Nobel Coatings, Inc.*,
791 N.E.2d 1031 (Ohio Ct. App. 2005).................................................. 19, 20

*Scheid v. Fanny Farmer Candy Shops, Inc.*,
859 F.2d 434 (6th Cir. 1988) ............................................................... 12

*Sexton v. City of Mason*,
883 N.E.2d 1013 (Ohio 2008)............................................................... 21

*Sharp v. Ingham Cnty.*,
23 F. App'x 496 (6th Cir. 2001) ........................................................... 9, 10

*Splendorio v. Bilray Demolition Co.*,
682 A.2d 461 (R.I. 1996)...................................................................... 27, 28

*Taylor v. Cincinnati*,
55 N.E.2d 724 (Ohio 1944)................................................................... 23

*Terry v. Caputo*,
875 N.E.2d 72 (Ohio 2007).................................................................. 11

*Thunander v. Uponor, Inc.*,
887 F. Supp. 2d 850 (D. Minn. 2012) ................................................... 21, 26

*Townsend v. Williger*,
No. 5:05-CV-02540, 2006 WL 721394 (N.D. Ohio Mar. 16, 2006) ......... 16

*Uddin v. Embassy Suites Hotel*,
848 N.E.2d 519 (Ohio Ct. App. 2005) ................................................... 9

*Uland v. S.E. Johnson Cos.*,
No. WM-97-005, 1998 WL 123086 (Ohio Ct. App. Mar. 13, 1998) ......... 23

*Valentine v. Conrad*,
850 N.E.2d 683 (Ohio 2006)............................................................................... 12-13

*Valentine v. PPG Indus., Inc.*,
821 N.E.2d 580 (Ohio Ct. App. 2004) ..................................................................... 12

*Weir v. E. Ohio Gas Co.*,
No. 01 CA 207, 2003 WL 1194080 (Ohio Ct. App. Mar. 12, 2003)........................... 22

*Whittiker v. Deutsche Bank Nat'l Trust Co.*,
605 F. Supp. 2d 914 (N.D. Ohio 2009).................................................................... 10

*Woods v. Willis*,
No. 3:09CV2412, 2010 WL 3808279 (N.D. Ohio Sept. 27, 2010) ........................... 2-3

*Yeager v. Carpenter*,
No. 14-09-19, 2010 WL 3081441 (Ohio Ct. App. Aug. 9, 2010)............................... 21

*Younglove Constr., LLC v. PSD Dev., LLC*,
782 F. Supp. 2d 457 (N.D. Ohio 2011)..................................................................... 20

**Statutes, Rules, and Regulations**

28 U.S.C. § 1446(a) ................................................................................................... 7

Fed. R. Civ. P. 8(a) ................................................................................................... 8

Fed. R. Civ. P. 12(b)(6).............................................................................................. 8

Ohio Rev. Code Ann. § 2307.011(D) ........................................................................ 16

**Other Authorities**

Restatement (Second) of Torts § 519 (1977)........................................................ 27, 29

Restatement (Second) of Torts § 520 (1977)............................................................. 28

Restatement (Second) of Torts § 520, cmt. c (1977) ................................................ 29

**INTRODUCTION**

Plaintiffs bring this putative class action lawsuit against Whirlpool Corporation

("Whirlpool"), Grist Mill Creek LLC ("GMC"), and John Does, for alleged personal injuries and

property damage supposedly caused by "toxic chemical sludge" buried beneath a former

recreational park Whirlpool owned until 2008 (the "Park") and at various unidentified,

"undisclosed locations" around Clyde, Ohio. (Am. Compl. ¶¶ 27, 46, attached hereto as Ex. A.)

Plaintiffs seek to hold Whirlpool liable for damage to property interests (Count One), continuing

nuisance (Count Two), medical monitoring (Count Three), strict liability (Count Four), personal

injury (Count Five), and wrongful death (Count Six). The Amended Complaint, however,

contains virtually no factual allegations that support these claims, and it should be dismissed.

Plaintiffs' claims for personal injuries and a wrongful death fail because, among other

reasons, they plead no facts showing that Whirlpool negligently or recklessly dumped chemicals

at the Park or elsewhere in or near Clyde. (*Id.* ¶¶ 30-54.) Their personal injury claims also fail

because Plaintiffs do not plead any facts showing that they actually were exposed to

environmental toxins, much less specific "toxic manufacturing chemicals" produced by

Whirlpool's operations. (*Id.* ¶¶ 1-27.) In fact, most Plaintiffs do not even claim that they visited

the Park. (*Id.* ¶¶ 4-18.) None claim to have visited any other "undisclosed locations around

Clyde" that supposedly contain "toxic waste materials." (*Id.* ¶ 46; *see also id.* ¶¶ 1-26.) Even for

the small minority of Plaintiffs who claim they visited the Park, most do not allege any personal

injury at all, and no Plaintiff alleges any facts showing how or when he or she personally was

exposed to toxins. (*Id.* ¶¶ 2, 19-20, 22-26, 31-35.) Further, not a single Plaintiff alleges that his

or her treating physicians or any state or federal regulatory agency attributed any illnesses or

health condition to environmental toxic exposures, to the Park, or to Whirlpool's operations that have been the economic heart of Clyde for more than 60 years. (*Id.* ¶¶ 1-48.)

With respect to Plaintiffs who claim property damage, no Plaintiff alleges any facts showing that any specific toxic chemicals were found on his or her property. (*Id.* ¶¶ 4, 16-17, 19, 22, 70-74.) Further, none of them alleges facts that would support "negligent, reckless, or intentional contamination" by Whirlpool, much less facts showing how or when the alleged underground toxic chemicals at the Park or other unidentified "contaminated sites" could possibly have been transported onto their own properties. (*Id.* ¶ 71.)

In short, the Amended Complaint simply alleges that (1) some Plaintiffs developed cancer or other illnesses during their lifetimes, and (2) that the U.S. Environmental Protection Agency ("U.S. EPA") found a presence of polychlorinated biphenyls ("PCBs") and other chemicals in the Park's subsurface soil. Plaintiffs then ask the Court to connect those two facts and find that Whirlpool is responsible for their personal injuries, a death, and property damages. Such speculative inferences are improper, especially where the Amended Complaint is barren of facts and where there are well-known facts that destroy such inferences—facts the Court can and should take judicial notice of.[1] *See Woods v. Willis*, No. 3:09CV2412, 2010 WL 3808279, at *7

---

[1] For example, it is well known that the lifetime risk of developing cancer is 41% for all U.S. residents, *see* National Cancer Institute, *SEER Cancer Statistics review 1975-2009*, available at http://seer.cancer.gov/csr/1975_2009_pops09/results_merged/topic_lifetime_risk_diagnosis.pdf, attached hereto as Ex. B, and that exposure to environmental pollutants accounts for just 2% of cancer deaths, *see* Ohio Dep't of Health, *Exposure to Toxic Chemicals and Cancer*, attached hereto as Ex. C. Moreover, Plaintiffs admit that the Ohio Department of Health ("ODH") and the Ohio Environmental Protection Agency ("Ohio EPA") studied 14 sites for potential environmental contamination in connection with the study of childhood cancer in Sandusky County, and "[n]o significant findings were made," including with respect to Whirlpool's sites. (Am. Compl. ¶ 41; *see* ODH et al., *Childhood Cancer among Residents of Eastern Sandusky County*, Oct. 30, 2009, attached as Ex. D (the "Ohio Report").) After studying the childhood cancer cases in the cluster, the ODH concluded that "[t]here were no exposures or variables that

n.7 (N.D. Ohio Sept. 27, 2010) (Carr, J.) (courts may consider public records and matters of

which a court may take judicial notice on a 12(b)(6) motion). The Court should dismiss the

Amended Complaint because Plaintiffs have pled no plausible factual basis for their claims.

## RELEVANT BACKGROUND

I.     **STATEMENT OF ALLEGED FACTS**

    A.     **Whirlpool's Ownership, and Plaintiffs' Use, of the Park**

Plaintiffs allege that Whirlpool owned and operated the Park for employees and members

of the public from 1953 until 2008, at which time Whirlpool sold the Park to GMC. (Am. Compl.

¶¶ 27, 31, 44.) During its heyday, the Park was "widely used by generations of citizens of Clyde,

Green Springs, and Sandusky County for its recreational opportunities," including "a picnic

shelter, an in-ground outdoor pool, basketball court, tennis court, volleyball court, creek, pond,

and other outdoor recreational amenities." (*Id.* ¶¶ 32-33.) The pool was filled with water from

Grist Mill Creek, which flows through the Park from South to North. (*Id.* ¶ 35.)

Plaintiffs are 22 adults who live in Sandusky County, Fulton County, or Wood County,

Ohio. (*Id.* ¶¶ 1-26.) Among Plaintiffs, however, only Tim Lagrou (on behalf of decedent

Christina Lagrou), Mark Gill, Gail Gill, Melanie Gill, Mariah Strayer, Sam Strayer, Adysan Gill,

and Abigail Gill allege that they visited or lived near the Park. (*Id.* ¶¶ 1-2, 19-20, 22-26.) None

of the remaining 14 Plaintiffs allege that they ever visited or used the Park. (*Id.* ¶¶ 3-18, 21.)

---

were common to the 21 children with cancer who participated in this profile." Sandusky County
Health Department & ODH, *Childhood Cancer in Eastern Sandusky County, 1996-2010: A
Profile of 21 Cases*, May 26, 2011, at 4, attached as Ex. E. Given the substantial lifetime risk of
developing cancer, and given the findings of the regulatory agencies that have studied childhood
cancer incidence in Sandusky County, Plaintiffs cannot simply allege, "I have cancer" or "I have
some other medical condition," and ask the court to infer that Whirlpool is therefore responsible.

B.      The Childhood Cancer Cluster in Sandusky County

Plaintiffs allege that, beginning in the winter of 2005, the Sandusky County Health Department ("SCHD") received telephone calls regarding a large number of childhood and young adult cancer cases in Sandusky County. (Am. Compl. ¶ 36.) The telephone calls led the SCHD and the ODH to conduct an investigation, beginning in June 2006, into the number of cancer cases. (*Id*. ¶ 37.) That investigation revealed a higher number of childhood cancer cases than expected, as well as a higher number of brain and central nervous system cancers than expected, in a distinct geographic area. (*Id*. ¶ 38.) That led to a follow-up investigation, which allegedly showed clustering of childhood and young adult cancers of multiple types in the northeastern portion of Sandusky County extending into southeastern Ottawa County and northwestern Erie County, with a radius of 7.25 miles. (*Id*. ¶ 39.)

Due to these findings, in March 2008 the Ohio EPA started environmental monitoring in Clyde. (*Id*. ¶ 40.) On October 30, 2009, the Ohio EPA and ODH identified 14 sites for environmental investigation in its Ohio Report. (*Id.* ¶ 41.) The Amended Complaint concedes that "[n]o significant findings were made." (*Id*.)

Coinciding with this Ohio EPA investigation, the ODH and the U.S. EPA established a telephone hotline for individuals to inform the U.S. EPA of potential dumpsites in the area. (*Id*. ¶ 41.) Through this hotline, the U.S. EPA received a report that Whirlpool had filled in the area surrounding and under the basketball court in the Park with "black sludge-like material." (*Id*. ¶ 42.) The U.S. EPA subsequently conducted a site assessment and issued a report entitled "Site Assessment Report for the Whirlpool Park Site Green Springs, Sandusky County, Ohio" (the "EPA Report"). (*Id*.) The EPA Report concluded that some of the soil underneath the Park contained PCBs and total metals at levels exceeding the U.S. EPA's regional screening levels for <u>residential</u> properties and exceeding the U.S. EPA's requirements for PCB spill cleanup. (*Id*. ¶ 43

4

(emphasis added because the Park was not a residential property).) The assessment revealed a "9.5-foot layer of mottled gray and black sludge fill material with a petroleum odor" under 0.5 feet of top soil. (*Id.*) Plaintiffs do not allege that U.S. EPA, or anyone else, concluded that Park visitors were exposed directly to PCBs or metals, much less that anyone ingested those materials and became ill as a result. (*Id.* ¶¶ 36-43.)

Based on these less-than-sparse factual allegations, Plaintiffs conclude that Whirlpool "dumped" toxic chemicals at the Park. (*Id.* ¶¶ 47, 77.) Plaintiffs further allege that Whirlpool "dumped and disposed of toxic waste materials from its manufacturing facility in Clyde, Sandusky County, Ohio into the ground and water in undisclosed locations around Clyde, Ohio and within the Cancer Cluster geographic region." (*Id.* ¶ 46.) Plaintiffs do not provide any facts at all regarding the "undisclosed" sites. (*Id.* ¶¶ 1-119.) They also plead no facts to contradict the conclusions of the Ohio EPA and ODH. (*Id.* ¶¶ 41-43.)

## C.  Plaintiffs' Alleged Injuries

Plaintiffs allege that Christina Lagrou ("Ms. Lagrou") used the Park from her birth in 1983 until she died in 2006 from large cell lymphoma "as a result of exposure to" the "toxic manufacturing chemicals which defendants dumped" at the Park. (Am. Compl. ¶ 2.) Plaintiffs do not allege any facts that, if true, would show that Ms. Lagrou actually was exposed to PCBs or metals under the basketball court at the Park (*e.g.*, how she physically came into contact with or ingested any underground chemicals). Plaintiffs further allege that Ms. Lagrou exposed her minor child, Hayden Lagrou, to PCBs or other chemicals *in utero*, but offer no details as to how this might have occurred. (*Id.* ¶¶ 2, 3.) Hayden Lagrou does not claim personal injury. (*Id.* ¶ 3.)

Along with Hayden Lagrou, Plaintiffs Sarah Requena, Mark Gill, Gail Gill, Austin Gill, Ashtyn Gill, Melanie Gill, McKenna Strayer, Hudson Strayer, Mariah Strayer, Sam Strayer, Adysan Gill, and Abigail Gill do not allege any personal injury. (*Id.* ¶¶ 6, 19-20, 22-26.)

5

Although each of these individuals, except Ms. Requena, alleges that he or she used the Park for recreational purposes and have lived within 1500 feet of the Park, none alleges any facts showing how they were exposed to underground chemicals at the Park or the "undisclosed" sites. (*Id.*)

Plaintiffs Connie Patrick, Ryan Patrick, Connor J. Requena, Brandon Weiker, Thomas F. Mathers Jr., Sandra Sage, Aaron Sage, Robbin Krotzer, Tina Metzger, Angela Metzger, Brandon Zienta, Emmagene Hackenburg, Diane Caldwell, and Jason Caldwell allege they have contracted at least seven different types of cancer (large cell lymphoma, leukemia, non-Hodgkin's lymphoma, throat cancer, breast cancer, cervical cancer, foot cancer) and suffer from various other ailments (including diabetes, fibromyalgia, and unspecified illnesses related to their thyroid, immune, and neurological systems). (*Id.* ¶¶ 4-18.) Plaintiffs refer to these individuals as the "Personal Injury Plaintiffs." (*Id.* ¶ 101.) Each Personal Injury Plaintiff baldly alleges, with no well-pled facts, that he or she contracted the illness "as a result of exposure to toxic manufacturing chemicals which defendants dumped or distributed at Whirlpool Park or other locations in and around Clyde, Ohio." (*Id.* ¶¶ 2, 4-18, 21.) None claims to have visited the Park or "undisclosed" sites, and none alleges facts showing personal exposures to toxic chemicals. (*Id.*) Plaintiffs Connor J. Requena and Thomas F. Mathers Jr. do not even allege that they live or lived within the "cancer cluster" region. (*See id.* ¶¶ 6-7, 9.)

Plaintiffs Connie Patrick, Emmagene Hackenburg, Diane Caldwell, Mark Gill, and Melanie Gill further allege that their "property has been damaged by defendants." (*Id.* ¶¶ 4, 16-17, 71.) Plaintiffs refer to these individuals as the "Representative Property Plaintiffs." (*Id.* ¶ 71.) Although they allege that the "toxic chemicals" have "escaped" from the Park (*id.* ¶ 78), Plaintiffs do not allege that they have discovered any chemicals on their properties, much less explain how or why the chemicals derived from the Park (*i.e.*, what chemicals were found, where

they were found, the basis for alleging that the materials escaped from the Park or the "undisclosed" sites, etc.). Plaintiffs baldly allege that their properties have lost value because they are "in the immediate vicinity of the contaminated sites, downstream from said sites, and within the cancer cluster geographic region." (*Id.* ¶ 71.)

## II.     PROCEDURAL HISTORY

On March 28, 2013, Plaintiffs filed this action in the Court of Common Pleas for Sandusky County, Ohio. They served the Complaint on Whirlpool the following day via certified mail. On April 26, 2013, at approximately 12:00 p.m., Whirlpool removed this action to this Court pursuant to the Class Action Fairness Act. Shortly before filing the removal papers, counsel for Whirlpool checked the Common Pleas docket to confirm that they had all process, pleadings, and orders that needed to be included with the removal papers. Having confirmed that there were no new filings, Whirlpool filed its notice of removal and attached Plaintiffs' original complaint and the other process and pleadings that had been served. At 12:30 p.m., Whirlpool emailed Plaintiffs' counsel a courtesy copy of the removal papers.

At 4:22 p.m. on April 26, after Whirlpool had filed its removal papers in both this Court and the Common Pleas court, the receptionist at Albrechta & Coble (Plaintiffs' law firm) emailed Whirlpool's counsel and forwarded a copy of Plaintiffs' Amended Complaint, which Plaintiffs had filed on April 25, but which the Common Pleas clerk's office had not yet served or docketed. Because Plaintiffs had not served Whirlpool with a copy of the Amended Complaint before Whirlpool removed the case to this Court, Whirlpool's removal was proper even though it did not include a copy of the Amended Complaint. *See* 28 U.S.C. § 1446(a) (requiring attachment of all pleadings which have been "served" in the state court proceedings); *Miami Valley Hosp. v. Cmty. Ins. Co.*, No. 3:05-cv-297, 2006 WL 2252669, at *9 (S.D. Ohio Aug. 7, 2006) (rejecting argument that the notice of removal was defective because it did not include a

copy of an amended complaint that had not been served on the defendant prior to removal). Although Plaintiffs have not yet filed their Amended Complaint in this Court, Whirlpool believes that Plaintiffs intend for the Amended Complaint to be the operative complaint going forward. Thus, Whirlpool's motion addresses the allegations in Plaintiffs' Amended Complaint.

## ARGUMENT

### I.    STANDARD OF REVIEW

Dismissal of a complaint pursuant to Rule 12(b)(6) is proper where the complaint does not "contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Under Rule 8(a), a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original). The complaint must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That standard "asks for more than a sheer possibility that a defendant has acted unlawfully" and requires more than facts that are merely consistent with liability. *Id.* Although the Court must presume all well-pled factual allegations are true, that "tenet . . . is inapplicable to legal conclusions." *Id.*; *see New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011) ("[C]ourts may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action.").

## II.     THE LAGROUS AND PERSONAL INJURY PLAINTIFFS FAIL TO STATE NEGLIGENCE CLAIMS FOR WRONGFUL DEATH AND PERSONAL INJURY[2]

A plaintiff asserting personal injury or wrongful death claims premised upon negligence must allege (1) the existence of a legal duty, (2) that the defendant breached that duty, and (3) that the breach of duty proximately caused injury to the plaintiff or decedent's death. *E.g.*, *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 529 N.E.2d 449, 454 (Ohio 1988); *Kerner v. Terminix Int'l Co.*, No. 2:04-CV-735, 2008 WL 163609, at *4 (S.D. Ohio Jan. 17, 2008). The Amended Complaint fails to allege facts necessary to support the second and third elements.

### A.     Plaintiffs Fail to Allege Facts Showing Whirlpool Breached a Duty

Plaintiffs must allege facts that, if true, show Whirlpool breached a duty it owed to Plaintiffs. *See Uddin v. Embassy Suites Hotel*, 848 N.E.2d 519, 522 (Ohio Ct. App. 2005). Here, at a minimum, Plaintiffs must allege facts showing that Whirlpool dumped PCBs or toxic materials at the Park. Plaintiffs have not done even that. Although they assert a conclusory allegation that Whirlpool "dump[ed] toxic materials at Whirlpool Park" (Am. Compl. ¶ 47), they plead no facts regarding the alleged "dumping." (*Id.* ¶¶ 42, 47, 77.) These allegations are nothing more than rumor, innuendo, and unwarranted inferences masquerading as "facts," and they should not be accepted as true. *See Sharp v. Ingham Cnty.*, 23 F. App'x 496, 498 (6th Cir. 2001) ("The court is not, however, bound to accept as true unwarranted factual inferences or legal conclusions unsupported by well-pleaded facts." (citations omitted)).

For instance, Plaintiffs misrepresent the EPA Report to manufacture the alleged breach of

---

[2] Plaintiffs allege that their injuries were caused by "defendants' intentional, reckless, or negligent" actions. (Am. Compl. ¶¶ 102-04, 117.) Because "[t]he elements of a personal injury claim vary depending upon the nature of the claim," *Maddox v. L.O. Warner, Inc.*, No. 15468, 1996 WL 50152, at *5 (Ohio Ct. App. Feb. 7, 1996), Plaintiffs' "personal injury" and "wrongful death" claims must be analyzed under theories of both negligence and intentional tort.

duty. Specifically, Plaintiffs allege that the U.S. EPA reported that "at some time during Whirlpool's ownership of the property, dumping of a toxic chemical sludge which included [PCBs] occurred at Whirlpool Park." (Am. Compl. ¶ 27 (emphasis added).) That "fact" does not appear anywhere in the EPA Report. (*See* EPA Report at 1-6, attached hereto as Ex. F.) The Court should consider as part of Plaintiffs' pleading the EPA Report because the Report is "referred to in [Plaintiffs'] complaint" and is "central to the claims"—indeed, the Report forms the entire alleged factual basis for Plaintiffs' claims that Whirlpool breached a duty and that Whirlpool's conduct caused their injuries. *See Whittiker v. Deutsche Bank Nat'l Trust Co.*, 605 F. Supp. 2d 914, 924 (N.D. Ohio 2009). Accordingly, Plaintiffs' conclusory "dumping" allegation can and should be ignored.[3] *See Davis v. World Sav. Bank, FSB*, 806 F. Supp. 2d 159, 172 (D.D.C. 2011) ("[W]hen the bare allegations of the complaint conflict with any exhibits or documents, whether attached or adopted by reference, the exhibits or documents prevail.").

Although Plaintiffs correctly point out that the U.S. EPA found some PCBs underground at the Park, they leap to the unwarranted conclusion that Whirlpool is responsible for "dumping" those PCBs. But, again, the EPA Report contains no such finding. (Ex. F at 1-6.) This is precisely the type of conclusory allegation and inference that the Supreme Court and Sixth Circuit have determined are insufficient to withstand a motion to dismiss. *See, e.g.*, *Sharp*, 23 F. App'x at 499 ("It is not enough for a complaint to contain mere conclusory allegations of [wrongful conduct]. Some factual basis for such claims must be set forth in the pleadings."); *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 407 (6th Cir. 1998) (upholding dismissal where the

_____

[3] In any event, Plaintiffs' allegation that "dumping" occurred does not suggest Whirlpool is the party responsible for it, as Plaintiffs themselves point to the conduct of not-yet-identified parties whom Plaintiffs believe are responsible for "dumping." (Am. Compl. ¶¶ 51-52.)

plaintiff's "attempts at showing a retaliatory motive . . . amount[ed] to nothing more than unwarranted factual inferences and legal conclusions that are insufficient to state a claim").

**B.      Plaintiffs Fail to Plead Facts Supporting Their Speculation that Whirlpool's Alleged Breach of Duty Proximately Caused Their Injuries**

To state a "prima facie case involving an injury caused by exposure to . . . [a] toxic substance, a claimant must establish (1) that the toxin is capable of causing the medical condition or ailment (general causation), and (2) that the toxic substance in fact caused the claimant's medical condition (specific causation)." *Terry v. Caputo*, 875 N.E.2d 72, 77 (Ohio 2007);[4] *see also Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676–77 (6th Cir. 2011) ("In a toxic-tort case, as here, the plaintiff must establish both general and specific causation through proof that the toxic substance is capable of causing, and did cause, the plaintiff's alleged injury."). Plaintiffs do not sufficiently plead facts in support of the causation element of their negligence claim.

**1.      Plaintiffs fail to allege that PCBs or other (unnamed) chemicals found at the Park are generally capable of causing their alleged injuries**

Plaintiffs rely solely on the existence of PCBs and other unidentified "materials" beneath the Park (and at other unspecified locations) to plead causation. But "it is well-settled that the mere existence of a toxin in the environment is insufficient to establish causation without proof that the level of exposure could cause the plaintiff's symptoms." *Pluck*, 640 F.3d at 679. Without additional factual allegations, Plaintiffs' reliance on the mere existence of PCBs underground at the Park and the generic allegations that PCBs are "hazardous," "toxic," and "a known carcinogen" are insufficient to plead general causation. (Am. Compl. ¶¶ 87, 89.)

---

[4] The *Terry* court discussed the requirements for stating a personal injury claim based on exposure to a toxic substance in the context of a motion for summary judgment. Here, although the Court is not examining evidence as it would on a motion for summary judgment, *Terry* is still instructive as Plaintiffs have not adequately pled facts in support of the elements of their claim.

Critically, Plaintiffs fail to link the PCBs to specific diseases; instead, they conclusorily allege only that unspecified "high levels of PCBs, metals, and other toxic chemicals" increase a person's risk of "contracting one or more serious and life-threatening or life-ending diseases." (*Id*. ¶ 89; *see also id*. ¶¶ 101-02). According to Plaintiffs, the PCBs or other unidentified "materials" caused unrelated cases of large cell lymphoma, leukemia, non-Hodgkin's lymphoma, throat cancer, breast cancer, cervical cancer, foot cancer, diabetes, and fibromyalgia, as well as other unspecified developmental, reproductive, thyroid, immune system, and neurological conditions. (*Id*. ¶¶ 2, 4-18, 21, 101.) But Plaintiffs fail to allege any facts showing that PCBs are <u>capable</u> of causing <u>each</u> such illness or unnamed condition.

Plaintiffs also fail to identify the concentrations at which PCBs present clinically significant health risks, much less that each Plaintiff personally was exposed to PCBs at such concentrations. These omissions are particularly glaring because the EPA Report contains a detailed account of the varying concentrations of substances found at the Park (Ex. F at Table 1), but Plaintiffs do not even attempt to allege—because they cannot do so in good faith—that these concentrations are sufficient to cause each of their illnesses or conditions. *See Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 437 (6th Cir. 1988) ("[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist." (quoting *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976))).

### 2. Plaintiffs fail to allege facts showing that Whirlpool's alleged breach of duty specifically caused their injuries

Specific causation requires a plaintiff to "show that he was exposed to the toxic substance and that the level of exposure was sufficient to induce the complained-of medical condition." *Valentine v. PPG Indus., Inc.*, 821 N.E.2d 580, 588 n.1 (Ohio Ct. App. 2004), *aff'd sub nom.*

*Valentine v. Conrad*, 850 N.E.2d 683 (Ohio 2006); *accord Pluck*, 640 F.3d at 677. The Amended Complaint falls well short of pleading facts that support this requirement.

Plaintiffs' only causation allegations are conclusions. Each Personal Injury Plaintiff alleges only that he or she "has contracted" cancer or "suffered" an illness "as a result of [his or her] exposure to toxic manufacturing chemicals which defendants dumped or distributed at Whirlpool Park or other locations in or around Clyde, Ohio." (Am. Compl. ¶¶ 4-5, 7-18.) They categorically allege that "[a]s a direct and proximate result of defendants' intentional, reckless, or negligent handling and disposal of toxic and hazardous chemicals, including PCB's, Personal Injury Plaintiffs were caused personal injury." (*Id*. ¶ 102.) Similarly, Plaintiffs generically plead that Ms. Lagrou died "as a result of exposure to toxic manufacturing chemicals which defendants dumped at Whirlpool Park" (*id*. ¶ 2) and that her "death was caused by defendants' intentional, reckless, or negligent handling and disposal of toxic and hazardous chemicals, including PCBs" (*id*. ¶ 117). Those allegations are insufficient. *See In re Heparin*, MDL No. 1953, 2010 WL 547322, at *2-3 (N.D. Ohio Feb. 9, 2010) (Carr, J.).

In *In re Heparin*, for instance, this Court dismissed a wrongful death claim where the plaintiff referred "vaguely to failures to comply with federal requirements, hemolysis, and Gambro's Class II recall," but did not allege that those failings (kinked tubing) were the cause of the plaintiff's injuries. *Id*.at 2. Rather, the plaintiff "summarily state[d] that decedent's injuries and death resulted '[a]s a direct and proximate result' of Gambro's actions." *Id*. at *2 (alteration in original). This Court determined that the plaintiff's allegations were "no more than 'formulaic recitation of the elements of a cause action,'" which are "insufficient to survive a motion to dismiss." *Id*. at *3 (quoting *Twombly*, 550 U.S. at 555).

Similarly here, Plaintiffs simply allege there are PCBs and toxic materials at the Park and at other undisclosed locations in Clyde, and then summarily conclude they were injured by those chemicals. But Plaintiffs fail to plead any facts showing that they have been exposed to underground PCBs, much less that their levels of exposure were sufficient to cause their cancers and other health conditions. (*See* Am. Compl. ¶¶ 4-5, 7-19 (concluding only that they were "expos[ed]" to PCBs and other unspecified chemicals).) In fact, no Personal Injury Plaintiff alleges he or she visited the Park, much less that he or she came into contact with PCBs buried beneath it. Nor do Plaintiffs allege that any of them came into contact with PCBs or other toxins buried beneath any other unnamed site. And Plaintiffs do not allege any facts showing that PCBs beneath the Park contaminated their drinking water, because there are no such facts.

Plaintiffs do allege that Ms. Lagrou used the Park "since she was born in 1983," was raised within 1500 feet of the Park, and that her mother used the Park while she was pregnant with Ms. Lagrou. (*Id.* ¶ 2.) But these allegations, without more, are insufficient to plead exposure. To the contrary, the EPA Report concluded that the levels of PCBs exceeding the EPA's PCB cleanup requirements were found well below ground level—at six to eight feet at one site and 10 to 12 feet at another site. (Ex. F at Figure 4.) The other four samples that were taken closer to the surface were well below the EPA's cleanup requirements.[5] (*Id.*) But Plaintiffs do not allege how Ms. Lagrou came into contact with PCBs located underneath the Park or how the levels of PCBs found at or near the surface caused any clinically significant health risk.

Plaintiffs also imply (but do not actually allege) that they were exposed to the "toxic" chemicals through swimming in or drinking contaminated water. (Am. Compl. ¶ 35 ("The pool

---

[5] The EPA applied a 50 mg/kg requirement for PCB cleanups. The levels of PCBs found at 0.5 to six feet below the ground, however, ranged from 0.25 to 3.7 mg/kg. (*See* Ex. F at Figure 4.)

at Whirlpool Park was filled using water from Grist Mill Creek which flows north past the

basketball courts and toxic sludge dump site . . . ."); *id.* ¶ 46 (Whirlpool "dumped and disposed

of toxic waste materials . . . into the ground and water in undisclosed locations").) But no

Plaintiff alleges that PCBs were transported from the ground into the Park's pool or that he or

she swam in the pool while it contained PCBs. And Plaintiffs' inference about drinking water is

directly contradicted by the Ohio Report referenced in the Amended Complaint. (*Id.* ¶ 41.) That

report explained that the Ohio EPA found no "carcinogenic health concerns" in water samples

taken from the cancer cluster geographic region:

> Drinking water sampling was conducted in January and February of 2009. Eleven
> drinking water samples were collected from two public water systems and
> domestic water wells. The samples were analyzed for a broad scan of
> carcinogenic and noncarcinogenic chemical compounds. <u>Results of the sampling
> did not identify any components of drinking water that suggest carcinogenic
> health concerns.</u> Additional sampling of drinking water was conducted in June
> 2009. . . . Samples were obtained from public water systems, domestic wells,
> reservoirs and a river intake. The analytical results are consistent with the
> previous drinking water quality results with the detection of low level
> concentrations of commonly used pesticides in water which is derived from a
> stream or reservoir. <u>No results from a treated drinking water sample exceeded a
> maximum contaminant health level standard.</u>

(Ex. D at 26 (emphasis added).) Thus, Plaintiffs' speculation that PCBs made their way into the

Park's pool, the region's waterways, and the potable water supply should be ignored.

Because the Amended Complaint fails to allege any facts showing that Ms. Lagrou and

the Personal Injury Plaintiffs were exposed to any PCBs or that any PCB exposures caused their

illnesses, the Court should not make these unsupported inferential leaps. *See, e.g.*, *Pinares v.*

*United Technologies Corp.*, No. 10-80883-CIV, 2011 WL 240522, at *4 (S.D. Fla. Jan. 19,

2011) (dismissing personal injury claim where the plaintiffs only alleged that they developed

cancer "as a direct and proximate result of [Defendant's] release of hazardous materials" but did

"not allege that any contaminant touched their property" and did "not provide any factual basis

15

for the allegation that Defendant is responsible for Plaintiff's cancer" (alteration in original)); *In re Heparin*, 2010 WL 547322, at *3 (dismissing claims where the "[p]laintiff never specifically alleges that decedent's dialysis machine had kinked tubing, nor ties the possible result of kinked tubing—hemolysis—to decedent's actual cause of death"); *Townsend v. Williger*, No. 5:05-CV-02540, 2006 WL 721394, at *4 (N.D. Ohio Mar. 16, 2006) ("The fact that [decedent's] death certificate lists his cause of death as dehydration does not, without more, lead to the inference that [defendant] negligently caused his dehydration or failed to properly care for his condition.").

Accordingly, the negligence claims in Counts Five and Six should be dismissed.

## III.  PLAINTIFFS FAIL TO STATE INTENTIONAL TORT CLAIMS FOR PERSONAL INJURY OR WRONGFUL DEATH

An "intentional tort claim" means "a claim alleging that a tortfeasor intentionally caused or intentionally contributed to the injury or loss to person . . . or that a tortfeasor knew or believed that the injury or loss to person or property or the wrongful death was substantially certain to result from the tortfeasor's conduct." Ohio Rev. Code Ann. § 2307.011(D). The Amended Complaint does not come close to alleging that type of tortious conduct because there are no well-pled facts suggesting Whirlpool (or anyone else for that matter) performed any act intending to cause Plaintiffs' harm or knowing that injury was substantially certain to result from its conduct. Indeed, Plaintiffs fail to plead facts showing (a) when the PCBs were dumped at the Park or at any other site; (b) that Whirlpool intended to dump PCBs or other unnamed "materials" at the Park; (c) that Whirlpool knew back in the 1950s that PCBs could or would cause injury or death; (d) that Whirlpool knew, at the time it transported or buried the PCBs or other unnamed "materials," that those materials were capable of causing death or injury but did it anyway; (e) that Whirlpool intended to cause any of the Personal Injury Plaintiffs' injuries or Ms. Lagrou's death; and (f) that the "materials" caused the Personal Injury Plaintiffs' injuries or

16

Ms. Lagrou's death. Without more, Plaintiffs have not pled personal injury or wrongful death claim based on intentional or reckless conduct, and Counts Five and Six should be dismissed.

## IV.    PLAINTIFFS' MEDICAL MONITORING "CLAIM" SHOULD BE DISMISSED

### A.    Ohio Does Not Recognize a Medical Monitoring Cause of Action

"Ohio law recognizes medical monitoring as a form of damages for an underlying tort," not as an independent cause of action. *Mann v. CSX Transp., Inc.*, No. 1:07-cv-3512, 2009 WL 3766056, at *3 (N.D. Ohio Nov. 10, 2009), *aff'd sub nom. Hirsch v. CSX Transp., Inc.*, 656 F.3d 359 (6th Cir. 2011); *see also First Prop. Grp., Ltd. v. Behr Dayton Thermal Prods. LLC*, No. 3:08-cv-329, 2011 WL 4073851, at *6 (S.D. Ohio Sept. 13, 2011) (granting motion to dismiss medical monitoring claim "without prejudice to Plaintiffs' ability to seek medical monitoring as a remedy"); *In re Telectronics Pacing Sys., Inc.*, 168 F.R.D. 203, 216 (S.D. Ohio 1996) ("[M]edical monitoring is . . . an element of damages rather than an independent cause of action under . . . Ohio . . . law."); *Day v. NLO*, 851 F. Supp. 869, 879-80 (S.D. Ohio 1994) ("Recognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery." (citation omitted)). Plaintiffs' "claim" (Count Three) should be dismissed because it is not an independent cause of action.

### B.    Plaintiffs Have Not Pled the Elements Necessary to Obtain a Medical Monitoring Remedy under Ohio Law

A plaintiff can obtain medical monitoring only if she pleads and proves all elements of an underlying tort, including general and specific causation. *Mann*, 2009 WL 3766056, at *3. Because Plaintiffs fail to state a claim under any cognizable theory (*see* Argument, Parts II-III, *supra*; Argument, Parts V-VIII, *infra*), they are not entitled to the remedy of medical monitoring.

Moreover, simple exposure to a disease-causing chemical is insufficient to obtain medical monitoring, and the Sixth Circuit has explicitly recognized that "[n]ot every increased risk of disease warrants increased medical scrutiny." *Hirsch*, 656 F.3d at 363. To obtain such a remedy, a plaintiff must plead and prove (1) that the toxin is a "known cause[] of human disease" and (2) that the plaintiff was exposed to the toxin "in an amount sufficient to cause a significantly increased risk of disease such that a reasonable physician would order medical monitoring." *Mann*, 2009 WL 3766056, at *3. Plaintiffs have not done this in their Amended Complaint.

Here, Plaintiffs identify only one alleged carcinogen by name—PCBs—and then conclude that the presence of "high levels of PCBs, metals, and other toxic chemicals" at the Park increased Plaintiffs' "risk of contracting one or more serious and life-threatening or life-ending diseases." (Am. Compl. ¶ 89.) The only specific factual allegations that even arguably suggest a link between PCBs and disease are Plaintiffs' allegations that the U.S. EPA lists PCBs among the top 10% of most toxic chemicals (*id.* ¶ 87) and that the U.S. EPA found that PCBs at the Park exceeded U.S. EPA standards (*id.* ¶ 86). The U.S. EPA's findings alone, however, cannot be used to support Plaintiffs' claim. *See Mann*, 2009 WL 3766056, at *5 (rejecting the plaintiffs' attempt to rely on the U.S. EPA soil cleanup level as a basis for justifying medical monitoring; "the EPA soil cleanup level represents a threshold for the cleanup of contaminated soil, not a danger point above which individuals require medical monitoring").

Further, Plaintiffs do not allege any facts showing that they were exposed to PCBs in an amount sufficient to cause a significantly increased risk of disease. (*See* Argument, Part II.B, *supra*.) As noted above, most Plaintiffs do not even allege that they visited the Park. (Am. Compl. ¶¶ 3-18, 21.) And the fact that certain Plaintiffs visited the Park or lived in the vicinity of the Park cannot support their conclusion that they were exposed to PCBs in an amount justifying

18

medical monitoring. *See Mann*, 2009 WL 3766056, at *4 ("Mere residence in the impact zone is insufficient evidence of contamination and increased risk because it ignores any individual variables, most notably, at what level the named Plaintiffs were actually exposed to dioxins.").

Finally, Plaintiffs fail to plead that, given their alleged PCB exposures, "a reasonable physician would order medical monitoring for them," *Hirsch*, 656 F.3d at 363, much less that any physician has ordered medical monitoring for them. Thus, Count Three should be dismissed.

## V.  THE REPRESENTATIVE PROPERTY PLAINTIFFS FAIL TO STATE A CLAIM FOR DAMAGE TO PROPERTY INTERESTS

The Representative Property Plaintiffs allege that their real estate has been "significantly damaged" because their properties are "in the immediate vicinity of the contaminated sites, down-stream from said sites, and within the cancer cluster geographic region." (Am. Compl. ¶ 71.) They further allege that "[t]he contamination, known health effects, and fear which typically result from high levels of PCBs and other toxic chemicals have decreased plaintiffs' property values." (*Id*. ¶ 72.) These allegations, which amount to some variety of environmental stigma, are insufficient to state a claim under Ohio law.

First, there is no standalone cause of action for "damage to property interest" in Ohio. To the extent that Plaintiffs intend to assert negligence, nuisance, or strict liability claims, with "lost property value" being the measure of damages, those claims fail because Plaintiffs have not adequately pled any of those claims. (Argument, Parts II-III, *supra*; *id.*, Part VII, *infra*.)

Second, Ohio does not recognize "lost property value" as a recoverable measure of damages when the basis for the alleged diminution is environmental stigma. In Ohio, "pure environmental stigma, defined as when the value of real property decreases due solely to public perception or fear of contamination from a neighboring property, does not constitute compensable damages." *Ramirez v. Akzo Nobel Coatings, Inc.*, 791 N.E.2d 1031, 1034 (Ohio Ct.

App. 2005); *see also Chance v. BP Chems., Inc.*, 670 N.E.2d 985, 993 (Ohio 1996) (rejecting argument that the "trial court should have allowed appellants to present evidence that environmental stigma associated with the deepwells had a negative effect on appellants' property values due to the public perception that there may have been injectate under appellants' properties and that the injectate may be dangerous"). Here, Plaintiffs seek to recover damages because their properties are "in the immediate vicinity" of the Park or other unidentified "sites" and have allegedly lost value due to the "[t]he contamination, known health effects, and fear which typically result from high levels of PCBs and other toxic chemicals." (Am. Compl. ¶¶ 71-72.) These are stigma damages, which are not available in Ohio. *See Younglove Constr., LLC v. PSD Dev., LLC*, 782 F. Supp. 2d 457, 462 (N.D. Ohio 2011) (Carr, J.) ("Ohio courts have denied recovery for stigma damages representing a decrease in property value 'due solely to public perception or fear,' and have required that a plaintiff 'must show actual harm.'" (quoting *Ramirez*, 791 N.E.2d at 1034)); *cf. Pinares*, 2011 WL 240522, at *4 ("Plaintiffs cannot state a claim for concerns based on media stories. Plaintiffs do not allege that they have suffered diminution in value of their property because of contamination. Rather, they base their alleged damages on media reports that allegedly caused a drop in property values.").

Although Plaintiffs conclusorily allege in Count Two—their continuing nuisance claim, not their property damage claim—that "[t]he toxic chemicals have escaped from Whirlpool Park to the lands and property of the Representative Property Plaintiffs" (Am. Compl. ¶ 78), they fail to plead any facts suggesting that their properties have actually suffered any physical damage. For instance, they make no allegation showing that they tested their property for contamination, no allegation showing that they discovered PCBs on their properties, and no allegation showing how PCBs have physically affected their properties. This dearth of facts is fatal. *See, e.g.*,

*Coppola v. Smith*, No. 1:11–cv–1257, 2013 WL 1281591, at *5 (E.D. Cal. Mar. 26, 2013) (dismissing CERCLA claim where plaintiff failed to specify when and what toxic substances entered plaintiff's property); *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 871 (D. Minn. 2012) (dismissing claims where the complaint was "devoid of any allegations demonstrating that Plaintiffs [had] tested their water to support their assertion of contamination"); *Pinares*, 2011 WL 240522, at *2 (dismissing property damage claims where the plaintiff merely concluded that contaminants had invaded their property but there was "no indication in the complaint that Plaintiffs have tested their property and found any contamination from any source").

## VI.     THE REPRESENTATIVE PROPERTY PLAINTIFFS FAIL TO PLEAD A CONTINUING NUISANCE CLAIM

### A.     Plaintiffs Do Not Allege a Continuing Nuisance

Ohio law recognizes two types of nuisances: permanent or continuing. *Ashtabula River Corp. Grp. II v. Conrail, Inc.*, 549 F. Supp. 2d 981, 984 (N.D. Ohio 2008). "A continuing nuisance arises when the wrongdoer's tortious conduct is ongoing, perpetually generating new violations. Conversely, a permanent nuisance occurs when the wrongdoer's tortious act has been completed, but the plaintiff continues to experience injury in the absence of any further activity by the defendant." *Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, 52 (Ohio Ct. App. 2007) (citations omitted). "[I]t is ongoing tortious conduct, and not merely recurring injury, that gives rise to a continuing nuisance or continuing trespass claim." *Yeager v. Carpenter*, No. 14-09-19, 2010 WL 3081441, at *6 (Ohio Ct. App. Aug. 9, 2010). "When determining whether a defendant has committed a continuing trespass, this Court may not consider whether the damage[] is ongoing or persists, rather, the Court must examine whether some ongoing tortious activity may be attributed to Defendant." *Lally v. BP Prods. N. Am., Inc.*, 615 F. Supp. 2d 654, 660 (N.D. Ohio 2009) (citing *Sexton v. City of Mason*, 883 N.E.2d 1013, 1018 (Ohio 2008)).

*Lally* is instructive here. The *Lally* plaintiff bought two parcels of land that previously had been owned by the Standard Oil Company. In 1993, years after Standard Oil sold the properties, the plaintiff discovered the presence of contaminants resulting from the release of petroleum. *Id*. at 657. The plaintiffs alleged that the ongoing contamination and failure to remediate constituted "ongoing tortious conduct." *Id*. at 661. The court disagreed, finding that the sale in 1965 meant that all tortious conduct had ceased by that date. *Id*. The court further found that the alleged failure to remediate was not an "ongoing tortious act" because the basis of the nuisance claim was the contamination, not the failure to remediate, and because the plaintiffs failed to show that Ohio law recognizes a duty to remediate. *Id*. at 662 ("[T]he Court has not been apprised of any duty to remediate at common law."); *see also Ashtabula River Corp.*, 549 F. Supp. 2d at 985 (rejecting the plaintiff's argument that the nuisance was continuing where the complaint did not "refer to any recent polluting activities"); *Weir v. E. Ohio Gas Co*., No. 01 CA 207, 2003 WL 1194080, at *7 (Ohio Ct. App. Mar. 12, 2003) ("[W]e find the 1989 leak was a single act which deposited contaminants on Appellants' property, the effects of which, and not the conduct of East Ohio was continuous and therefore a permanent trespass or nuisance.").

The same analysis applies here. In this case, the Representative Property Plaintiffs bring a claim for "continuing nuisance." (Am. Compl. at 20-22.) To that end, they conclude that "[s]ince 1953 the defendants created and maintained a nuisance on the property known as Whirlpool Park and other sites," which allegedly "continues to this day." (*Id.* ¶ 76.) The nuisance is allegedly caused by Whirlpool's "creat[ion] [of] toxic chemicals which were dumped at Whirlpool Park and other sites in the cancer cluster geographic region" (*id*. ¶ 77) and then "escaped from Whirlpool Park to the lands and property of the Representative Property Plaintiffs" (*id*. ¶ 78). Plaintiffs fail to allege, however, that the "dumping" or "escape" to their property occurred

22

repeatedly or even on more than one occasion. And Plaintiffs admit that Whirlpool sold the Park property to GMC in 2008, at which time any alleged dumping must have ceased. (*Id.* ¶¶ 27-28, 31.) Because the Amended Complaint contains no facts showing that "dumping" or "escaping" is continual, Plaintiffs have not pled a continuing nuisance claim.

### B. Plaintiffs Fail to Sufficiently Allege a Permanent Nuisance Claim

Even assuming that the Representative Property Plaintiffs intended to plead their "Continuing Nuisance" claim as a permanent nuisance claim, the permanent nuisance claim also fails as a matter of law. Under Ohio law, a "nuisance" is defined as "the wrongful invasion of a legal right or interest." *Kramer*, 882 N.E.2d at 51 (2007) (quoting *Taylor v. Cincinnati*, 55 N.E.2d 724, 727 (Ohio 1944)). It is "a distinct tort, consisting of anything wrongfully done or permitted that unreasonably interferes with another in the enjoyment of his property." *Natale v. Everflow E., Inc.*, 959 N.E.2d 602, 607 (Ohio Ct. App. 2011). For a nuisance to be actionable, "the invasion must be either (a) intentional and unreasonable or (b) unintentional but caused by negligent, reckless, or abnormally dangerous conduct." *Kramer*, 882 N.E.2d at 52. Plaintiffs also must plead that their injuries were proximately caused by Whirlpool's conduct. *See Uland v. S.E. Johnson Cos.*, No. WM-97-005, 1998 WL 123086, at *5 (Ohio Ct. App. Mar. 13, 1998).

### 1. Plaintiffs fail to sufficiently plead an "invasion" of their legal interests

To state a claim for nuisance, a plaintiff must plead that there was an "invasion" of their property. *See Kramer*, 882 N.E.2d at 51. Plaintiffs provide a single allegation in support of this element: "[t]he toxic chemicals have escaped from Whirlpool Park to the lands and property of the Representative Property Plaintiffs." (Am. Compl. ¶ 78.) But Plaintiffs provide no facts from which this Court can infer that any PCBs or other "materials" at the Park (or at any other site) in

fact escaped from the Park and was transported to Plaintiffs' properties.[6] For instance, they do not allege that they have discovered (via testing or otherwise) any chemicals on their properties, what contaminants they have discovered, or how those contaminants escaped from the Park to their properties (such that the Court can infer that the chemicals came from the Park as opposed to any other site in Northern Ohio). Although Plaintiffs need not plead every fact regarding the alleged invasion, they must do more than merely conclude that it occurred.[7] *See, e.g.*, *Pinares*, 2011 WL 240522, at \*4 ("A nuisance claim must allege contamination of the plaintiff's property. . . . Plaintiffs allege that their property was 'invaded' 'as set forth above,' but there are no allegations 'above' (or below), of any invasion of their property." (citation omitted)).

### 2. Plaintiffs fail to plead Whirlpool intended to cause Plaintiffs' injuries

Ohio law divides nuisance into two categories based on the level of the actor's culpability. "An absolute nuisance is based on either intentional conduct or an abnormally dangerous condition that cannot be maintained without injury to property, no matter what care is taken," while a "qualified nuisance is essentially a tort of negligent maintenance of a condition that creates an unreasonable risk of harm, ultimately resulting in injury." *State ex rel. R.T.G., Inc. v. State*, 780 N.E.2d 998, 1010 (Ohio 2002). "To recover damages for a qualified nuisance, negligence must be averred and proven." *Kramer*, 882 N.E.2d at 53.

Here, Plaintiffs conclusorily allege that "Defendants intended to cause the formation of these toxic chemicals and that the defendants intended the chemicals to escape to the lands of the

---

[6] Neither the EPA Report nor the Ohio Report state that any chemical has escaped from the Park. (*Compare* Am. Compl. ¶ 78, *with* Exs. D & F.)

[7] Plaintiffs' allegations with respect to the other "dump" sites are even more deficient. Although Plaintiffs conclude that Whirlpool "created and maintained a nuisance on the property known as Whirlpool Park <u>and other sites</u>," (Am. Compl. ¶ 76 (emphasis added)), they fail to allege that any chemicals "escaped" from these "other sites" to their properties (*id.* ¶ 78).

Representative Property Plaintiffs." (Am. Compl. ¶ 79; *see also id.* ¶ 83 ("Defendants'
intentional or reckless handling and disposal of toxic and hazardous chemicals, including PCBs,
was conducted willfully, wantonly, and maliciously . . . .").) Because Plaintiffs do not allege
negligent maintenance, their nuisance claim is necessarily one for absolute nuisance. Plaintiffs
fail, however, to allege any facts showing that Whirlpool intended for the PCBs and other
"materials" to escape to the Representative Property Plaintiffs' properties. As shown above,
Plaintiffs do not even allege facts that, if true, would show that Whirlpool was the party
responsible for burying PCBs or other "materials" at the Park, that Whirlpool knew that PCBs
had been buried in the Park, or that the PCBs had "escaped" to certain Plaintiffs' properties. In
short, the Amended Complaint falls well short of alleging intentional conduct by Whirlpool.

### 3.     Plaintiffs fail to allege the "toxic chemicals" caused Plaintiffs' injuries

To maintain an action for nuisance, "the injury must be real, material, and substantial."
*Banford v. Aldrich Chem. Co.,* 932 N.E.2d 313, 317 (Ohio 2010). "Damages for nuisance may
include diminution in the value of the property, costs of repairs, loss of use of the property, and
compensation for annoyance, discomfort, and inconvenience." *Id*. The damages must be
"connected to the person's loss of use or loss of enjoyment of property." *Id* at 319. Moreover, "in
order to recover damages for annoyance and discomfort in a nuisance claim, a plaintiff must
establish that the nuisance caused physical discomfort," *i.e.*, affected one or more of the
plaintiff's senses. *Id*.  at 318-19. "[F]ear and emotional harm alone are insufficient" nuisance
injuries without allegations of physical discomfort. *Id*.  at 319-20.

Here, the Representative Property Plaintiffs allege that they experienced "annoyance,
discomfort, and inconvenience" and "emotional distress" (Am. Compl. ¶ 82(c)), but they fail to
allege any facts showing they suffered physical discomfort <u>connected to the loss of use or
enjoyment of their property</u>. *See Banford,* 932 N.E.2d at 317. For example, Plaintiffs Mark Gill

and Melanie Gill do not allege that they suffered any physical harm whatsoever. They do not claim that PCBs on their property affected their "sight, sound, smell, hearing, or touch." *Id*. at 318; *see also id*. at 319 ("In cases in which courts have determined that circumstances did not rise to the level of nuisance and refused to award damages for annoyance and discomfort, the offending situation had no effect on the senses and thus no physical component of annoyance and discomfort."). In fact, they claim that they had no idea their property was contaminated until they read the EPA Report. (*See* Am. Compl. ¶ 54.)

Although Plaintiffs Connie Patrick, Emmagene Hackenberg, and Diane Caldwell allege that they suffered physical harm (*id*. ¶¶ 4, 16-17), they fail to allege any <u>facts</u> showing that their alleged illnesses were <u>caused by</u> the nuisance and "related to the use" of their property. To the contrary, Plaintiffs provide only the conclusory allegation that Plaintiffs Patrick's, Hackenberg's, and Caldwell's illnesses were a "result of her exposure to toxic manufacturing chemicals which defendants dumped or distributed at Whirlpool Park." (*Id*.) The Amended Complaint likewise contains no well-pled facts showing that the chemicals escaped from the Park onto their property or that their medical problems were caused by exposure to PCBs or unnamed "materials" that exist onto their <u>own</u> property. *See, e.g.*, *Thunander*, 887 F. Supp. 2d at 871.

Further, Plaintiffs' alleged injury in the form of "cleanup costs" is insufficient because they do not plead facts showing that they have actually incurred costs to remediate their property or even that they will need to remediate in the future. (Am. Compl. ¶¶ 75-84.) Nor have they alleged facts showing that the alleged nuisance (*i.e.*, the existence of PCBs or other "materials" on their own land) has decreased their properties' values. (*Id.*) Indeed, the only "fact" alleged regarding the alleged diminution in value is that the diminution was caused by their property

being in "the immediate vicinity of the contaminated sites." (*Id.* ¶ 71.) Because Plaintiffs fail to sufficiently allege injury as a result of the alleged nuisance, Count Two should be dismissed.

## VII. PLAINTIFFS FAIL TO PLEAD A STRICT LIABILITY CLAIM

### A. Plaintiffs Have Not Pled Facts Sufficient to State a Strict Liability Claim

To state a strict liability claim under Ohio law, Plaintiffs must plead that Whirlpool "carries on an abnormally dangerous activity" and that Plaintiffs suffered "harm . . . resulting from the activity." Restatement (Second) of Torts § 519 (1977); *see Hurier v. Ohio Dep't of Transp.*, No. 01AP-1362, 2002 WL 2005755, at *3 (Ohio Ct. App. Sept. 3, 2002) (strict liability attaches when "one is using one's land or property for activities, which are unreasonably hazardous"). Plaintiffs have not pled any facts sufficient to hold Whirlpool strictly liable.

First, Plaintiffs have not pled facts suggesting that Whirlpool carried on an abnormally dangerous activity. "Absolute liability attaches only to ultrahazardous or abnormally dangerous *activities* and not ultrahazardous or abnormally dangerous *materials*." *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 465-66 (R.I. 1996) (emphasis in original). Plaintiffs allege that "PCBs and the other toxic chemicals found at Whirlpool Park are abnormally dangerous." (Am. Compl. ¶ 95.) But whether PCBs and the other chemicals are "abnormally dangerous," "toxic," or "poisonous" is irrelevant. *See, e.g.*, *Splendorio*, 682 A.2d at 465-66 (holding that although asbestos is "understandably an ultrahazardous or abnormally dangerous material," strict liability does not attach merely because asbestos or another dangerous substance is involved).

 Plaintiffs' allegations that Whirlpool's "production and use [of PCBs and other chemicals] in manufacturing" and "[m]aintaining, storing, and disposing of PCBs and other toxic chemicals" were "abnormally dangerous activities" are insufficient. (*Id.* ¶¶ 95-96). When determining whether an activity is abnormally dangerous, courts consider the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520 (1977); *see Abraham v. BP Exploration & Oil, Inc.*, 778 N.E.2d 48, 53-54 (Ohio Ct. App. 2002). "For many courts, the analysis of whether an activity is abnormally dangerous revolves around factor (c), whether the activity can be made safe through the exercise of reasonable care." *Fletcher v. Conoco Pipe Line Co.*, 129 F. Supp. 2d 1255, 1261 (W.D. Mo. 2001); *cf. R.T.G., Inc.*, 780 N.E.2d at 1010 (affirming that coal mining is not an absolute nuisance "because it can be conducted safely when care is taken"); *Splendorio*, 682 A.2d at 466 ("[A]n activity is not abnormally dangerous if the risks therefrom could be limited by the exercise of reasonable care." (alteration in original) (citation omitted)).

Here, the Amended Complaint not only fails to address whether any of Whirlpool's alleged activities could be made safe through the exercise of reasonable care, but also fails to address any of the Restatement's other factors. Although Plaintiffs need not plead and prove each Restatement factor to establish the existence of an abnormally dangerous activity, they must allege more than the legal conclusion that the alleged activity is "abnormally dangerous." *See, e.g.*, *Bd. of Cnty. Comm'rs v. Brown Grp. Retail, Inc.*, 598 F. Supp. 2d 1185, 1196 (D. Colo. 2009) (dismissing strict liability claim for abnormally dangerous activities because the plaintiffs failed to allege specific facts relevant to the Restatement factors); *Ganton Techs., Inc. v. Quadion Corp.*, 834 F. Supp. 1018, 1020 (N.D. Ill. 1993) (granting motion to dismiss strict liability claim and stating "the PCB clean-up activities are not abnormally dangerous. There is no basis for believing any risk of harm could not be eliminated by the use of reasonable care.").

Second, Plaintiffs fail to sufficiently allege "harm . . . resulting from" Whirlpool's alleged abnormally dangerous activities. Restatement § 519. Instead, Plaintiffs merely conclude that their "personal and property interests" were damaged "[a]s a direct and proximate result of defendants' activities." (Am. Compl. ¶ 98.) But Plaintiffs Hayden Lagrou, Sarah Requena, Mark Gill, Gail Gill, Austin Gill, Ashtyn Gill, Melanie Gill, McKenna Strayer, Hudson Strayer, Mariah Strayer, Sam Strayer, Adysan Gill, and Abigail Gill do not allege that they have been injured in any way. (*See id.* ¶¶ 3, 6, 19-20, 22-26.) And the remaining Plaintiffs merely conclude, without any supporting facts, that their injuries were the "result of" exposure to PCBs or other "materials" that Whirlpool allegedly buried in the Park and at other sites. (*Id.* ¶¶ 2, 4-5, 7-18, 21.) These allegations are insufficient as a matter of law. *See, e.g.*, *In re Heparin*, 2010 WL 547322, at *2-3 (summarily alleging that injuries and death were "a direct and proximate result" of the defendant's actions "is insufficient to survive a motion to dismiss").

In short, because Plaintiffs fail to allege facts suggesting that Whirlpool engaged in any "abnormally dangerous activity" or that Whirlpool's alleged activities proximately caused their alleged harm, their claim for strict liability (Count Four) fails as a matter of law.

### B.    Plaintiffs' Strict Liability Claim Is Subsumed by Their Nuisance Claim and Should Be Dismissed for the Same Reasons

 "A claim for ultrahazardous activity is analytically identical to that of absolute nuisance." *Oros v. Hull & Assocs., Inc.*, 302 F. Supp. 2d 839, 848 (N.D. Ohio 2004) (internal quotation marks omitted); *see also Chance v. BP Chems., Inc.*, Nos. 66622, 66645, & 67369, 1995 WL 143827, at *7 (Ohio Ct. App. Mar. 30, 1995); Restatement (Second) of Torts § 520, cmt. c (1977) ("The rule of strict liability [for abnormally dangerous activities] frequently is applied by many courts . . . under the name of 'absolute nuisance.'"). Because Plaintiffs' nuisance claim requires them to establish liability based on an absolute nuisance, their strict

liability claim should be dismissed as redundant, and for the same reasons as their nuisance

claim. *See, e.g.*, *Neville v. City of Wyo.*, No. C-020064, 2002 WL 31094766, at \*3 (Ohio Ct.

App. 2002) ("We hold th[e] [strict liability] claim to be subsumed within the portion of the

absolute-nuisance claim involving inherently hazardous activities. Having found the absolute-

nuisance claim to be without merit, we also hold that summary judgment was proper on the

strict-liability claim.").

## <u>CONCLUSION</u>

For all these reasons, the Court should dismiss Plaintiffs' Amended Complaint.

Dated: May 3, 2013                              Respectfully submitted,

*s/Kip T. Bollin*
Kip T. Bollin (0065275)
Michael L. Hardy (0011717)
Thompson Hine LLP
127 Public Square
3900 Key Center
Cleveland, Ohio 44114
Telephone:(216) 566-5804
Facsimile: (216) 566-5800
Email:     kip.bollin@thompsonhine.com
           mike.hardy@thompsonhine.com

Michael T. Williams
Andrew C.S. Efaw (*pro hac vice*)
Joel S. Neckers
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
Telephone:(303) 244-1800
Facsimile: (303) 244-1879
Email:     williams@wtotrial.com
           efaw@wtotrial.com
           neckers@wtotrial.com

Stephen G. Morrison (*pro hac vice*)
Robert H. Brunson (*pro hac vice*)
Nelson Mullins Riley & Scarborough, LLP
1320 Main Street, Suite 1700
Columbia, South Carolina 29201
Telephone:(803) 255-9450
Facsimile: (803) 255-9057
Email:     steve.morrison@nelsonmullins.com
           robert.brunson@nelsonmullins.com

*Attorneys for Defendant Whirlpool Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 3rd day of May, 2013, a copy of the foregoing document

entitled **Memorandum in Support of Whirlpool Corporation's Motion to Dismiss Amended**

**Complaint** was filed electronically with the District Court. Notice of this filing will be sent to

counsel for all parties by operation of the Court's electronic filing system.


*s/Kip T. Bollin*
Attorneys for Defendant,
Whirlpool Corporation